J-S14020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BENJAMIN VILLANUEVA, III | |
| Appellant | No. 246 MDA 2015 |

Appeal from the Judgment of Sentence December 23, 2014
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0001712-2012

BEFORE:  FORD ELLIOTT, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, J.                        **FILED APRIL 04, 2016**

Appellant, Benjamin Villanueva, III, appeals from the judgment of sentence entered December 23, 2014, in the Court of Common Pleas of Lycoming County. We affirm.

We take the underlying history of this matter from the trial court's opinion.

> On October 11, 2009, two masked individuals entered the Sunoco A-Plus in South Williamsport, Pennsylvania…. They assaulted the clerk and stole numerous packs of cigarettes and approximately $150 in cash. When the suspects left the Sunoco, they headed west past Citizens and Northern Bank.
>
> The clerk provided a description of the individuals to the police, who also viewed the suspects on video surveillance from the Sunoco and the ATM at the front of the bank. One of the individuals was an approximately 5'8" tall male, who was

---

[*] Former Justice specially assigned to the Superior Court.

wearing a gray hoodie, a flesh-toned scary Halloween mask, dark colored gloves and faded blue jeans. The other individual was a taller male, who was wearing a green coat, a dark colored shirt with white on the front of it, a dark colored ski mask, dark colored gloves, and faded blue jeans. The eyeholes of the ski mask appeared to be rather large with white or gray material visible underneath, not exposed skin. The taller individual was also carrying a bright blue tote bag with white lettering or symbols on the side of it.

The police also found two cigarette butts on the ground in front of the bank. The butts were orange/tan in color and had two gold bands near the burnt end of the butts.

Unfortunately, the police were not able to locate and apprehend the suspects on October 11, 2009.

Two days later, on October 13, 2009, the South Williamsport police were dispatched to the 700 block of Matthews Boulevard to investigate a "suspicious person" report. There were two suspicious individuals seen behind residences near the Woodlands Bank on West Southern Avenue and a third individual in a gold vehicle. It was also reported that one of the individuals was hiding behind a nearby dumpster.

The police stopped the gold vehicle and identified the driver as Stephen Moore. The police ran the license plate, which came back to a different driver registered to Philip Hall's mother. Philip Hall was a friend of Moore's and an acquaintance of Appellant's.

Appellant, who fit the description of one of the suspicious individuals, was walking on the other side of the street and keeping a very close eye on the police during the traffic stop of the gold vehicle. Prior the vehicle being stopped, Appellant had been walking by the vehicle. When the police made contact with Appellant, he gave them a false name. Appellant also asked the police if "Stephen" got "locked up."

Officers walked over to the dumpster to look for the other suspicious person. Near the dumpster, the police found a flesh-colored Halloween mask and a pair of dark colored gloves. The Halloween mask matched the mask worn by the shorter suspect from the Sunoco robbery. A short distance west of the mask, the police discovered a white Halloween mask with reddish synthetic hair. Wrapped inside the mask was a loaded .22 caliber

- 2 -

handgun. It was apparent that the masks and other items had been recently placed there, as it was approximately 7:20 a.m. and the ground was covered in dew but the masks and other items of interest were not.

The police impounded the gold vehicle and obtained a search warrant. In the vehicle, the police found a black ski mask, a blue tote bag with white lettering, a green coat, and two pairs of faded blue jeans, which were consistent with the clothing worn and the bag used by the Sunoco robbers. Inside the ski mask was a long, red synthetic fiber similar to the reddish synthetic hair on the white Halloween mask. The police also found a packet of cigarettes in the vehicle, the color and markings of which matched the color and markings of cigarette butts recovered … in front of the bank on the they day of the Sunoco robbery.

DNA was obtained from inside the Halloween masks. The police obtained a warrant to take hair and blood samples from Appellant so DNA testing and analysis could be conducted to determine if the DNA in either of the Halloween masks matched Appellant's DNA. Although the DNA sample from the white mask with the reddish synthetic hair was a mixture of DNA from more than one individual, Appellant's DNA matched the DNA of the main contributor to that mixture. DNA from the flesh-colored Halloween mask matched Philip Hall.

Trial Court Opinion, 6/24/15 at 1-3.

Appellant was subsequently arrested and charged with robbery, theft by unlawful taking, receiving stolen property, simple assault, conspiracy to commit those crimes, and recklessly endangering another person. Appellant filed an omnibus pretrial motion to suppress the evidence obtained pursuant to the search warrant. Following a hearing, the trial court denied Appellant's suppression motion. Appellant also filed a motion *in limine* to preclude evidence of his prior conviction for conspiracy to commit robbery with

Stephen Moore, who was the driver of the gold vehicle impounded in this case. The trial court also denied that motion.

Appellant waived his right to a jury trial. Following a bench trial, the trial court convicted Appellant of all charges and sentenced him to an aggregate term of 5 to 12 years of imprisonment. Appellant thereafter filed timely post sentence motions, which the trial court denied. This timely appeal followed.

Appellant raises the following issues for our review.

I. Whether the trial court erred in denying [Appellant's] omnibus pre-trial motion?

II. Whether the trial court erred in denying [Appellant's] motion in limine filed on August 6, 2013 which sought to preclude the admission of a prior bad act?

III. Whether the evidence presented by the Commonwealth at trial was insufficient to establish the elements of each of the offenses charged?

IV. Whether the verdict of the jury was against the weight of the evidence to the extent it shocks one's sense of justice?

Appellant's Brief at 8 (unnecessary capitalization omitted).

Appellant first argues that the trial court erred when it denied his motion to suppress physical evidence. We review the denial of a motion to suppress physical evidence as follows.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains

uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

Further, [i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

*Commonwealth v. Houck*, 102 A.3d 443, 455 (Pa. Super. 2014) (internal citations and quotations omitted).

A search warrant cannot be used as a general investigatory tool to uncover evidence of a crime. *In re Casale*, 512 Pa. 548, 517 A.2d 1260, 1263 (1986); *Commonwealth ex rel. Ensor v. Cummings*, 416 Pa. 510, 207 A.2d 230, 231 (1965). Nor may a warrant be so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize, which would result in the general "rummaging" banned by the Fourth Amendment. *See Commonwealth v. Santner*, 308 Pa.Super. 67, 454 A.2d 24 (1982) (quoting *Marron v. United States*, 275 U.S. 192, 195, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). Thus, Pa.R.Crim.P. 205 specifies the necessary components of a valid search warrant. The comment to Rule 205 provides, however, that even though general or exploratory searches are not permitted, search warrants should "be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice." Pa.R.Crim.P. 205 (cmt.). Embracing this approach, we have held that "where the items to be seized are as precisely identified as the nature of the activity permits ... the searching officer is only required to describe the general class of the item he is seeking." *Commonwealth v. Matthews*, 446 Pa. 65, 85 A.2d 510 (1971).

A warrant is defective when its explanatory narrative does not describe as clearly as possible those items for which there is probable cause to search. *Grossman*, 521 Pa. 290, 555 A.2d 896. In assessing the validity of a description contained in a warrant, a court must initially determine for what items there was probable cause to search. *Id*. at 900. "The sufficiency of the

description [in the warrant] must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause [to search] and the description in the warrant requires suppression." *Id.*

*Commonwealth v. Rega*, 933 A.2d 997, 1011-1012 (Pa. 2007).

Appellant's second issue challenges the admissibility of evidence. We note that "the admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa. Super. 2012), *appeal denied*, 76 A.3d 538 (Pa. 2013) (citation omitted). In reviewing a court's decision to permit evidence of alleged prior bad acts, we note that it is impermissible to present evidence at trial of a defendant's prior bad acts or crimes to establish the defendant's criminal character or proclivities. *See* Pa.R.E. 404(b); *Commonwealth v. Hudson*, 955 A.2d 1031, 1034 (Pa. Super. 2008). Such evidence, however, may be admissible "where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Commonwealth v. Russell*, 938 A.2d 1082, 1092 (Pa. Super. 2007) (citation omitted). It is well settled that "[e]ven if prejudicial information was considered by the trial court, a judge, as fact finder, is presumed to disregard inadmissible evidence and consider only competent evidence." *Commonwealth v. Fears*, 836 A.2d 52, 71 n.19 (Pa. 2003) (citation omitted).

Appellant next claims that he was incorrectly identified as the perpetrator of the crimes for which was convicted. The following standard governs our review of a challenge to the sufficiency of the evidence.

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Mauz*, 122 A.3d 1039, 1040-41 (Pa. Super. 2015) (citation omitted).

The factfinder, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *See Commonwealth v. Valentine*, 101 A.3d 801, 805 (Pa. Super. 2014), *appeal denied*, 124 A.3d 309 (Pa. 2015). Furthermore, the Commonwealth may sustain its burden by means of wholly circumstantial evidence. *See Commonwealth v. Diggs*, 949 A.2d 873, 877 (Pa. 2008).

Lastly, Appellant argues that his convictions were against the weight of the evidence. A challenge to the weight of the evidence "concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the

ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." ***Commonwealth v. Orie***, 88 A.3d 983, 1015 (Pa. Super. 2014), ***appeal denied***, 99 A.3d 925 (Pa. 2014) (citation omitted).

> When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Gibbs***, 981 A.2d 274, 282 (Pa. Super. 2009) (internal quotes and citations omitted).

We have reviewed Appellant's issues raised on appeal, along with the briefs of the parties, the certified record and the applicable law. Having determined that the Honorable Marc F. Lovecchio's June 24, 2015 opinion ably and comprehensively disposes of Appellant's issues raised on appeal, with appropriate reference to the record and without legal error, we will affirm based on that opinion. ***See*** Trial Court Opinion, 6/24/15 at 5-19.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2016

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH            : No. CP-41-CR-1712-2012

                     :

vs.                       : CRIMINAL DIVISION

                     :

                     :

BENJAMIN VILLANUEVA,      :

**Appellant**              : 1925(a) Opinion

## OPINION IN SUPPORT OF ORDER IN COMPLIANCE WITH RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

This opinion is written in support of this court's judgment of sentence dated December 23, 2014, which became final when the court denied Appellant's post sentence motion on January 28, 2105. The relevant facts follow.

On October 11, 2009, two masked individuals entered the Sunoco A-Plus in South Williamsport, Pennsylvania to rob it. They assaulted the clerk and stole numerous packs of cigarettes and approximately $150 in cash. When the suspects left the Sunoco, they headed west past Citizens & Northern Bank.

The clerk provided a description of the individuals to the police, who also viewed the suspects on video surveillance from the Sunoco and the ATM at the front of the bank. One of the individuals was an approximately 5'8" tall male, who was wearing a gray hoodie, a flesh-toned scary Halloween mask, dark colored gloves and faded blue jeans. The other individual was a taller male, who was wearing a green coat, a dark colored shirt with white on the front of it, a dark colored ski mask, dark colored gloves, and faded blue jeans.

1

*copy to client 4/25*

The eyeholes of the ski mask appeared to be rather large with white or gray material visible underneath, not exposed skin. The taller individual was also carrying a bright blue tote bag with white lettering or symbols on the side of it.

The police also found two cigarette butts on the ground in front of the bank. The butts were orange/tan in color and had two gold bands near the burnt end of the butts.

Unfortunately, the police were not able to locate and apprehend the suspects on October 11, 2009.

Two days later, on October 13, 2009, the South Williamsport police were dispatched to the 700 block of Matthews Boulevard to investigate a "suspicious person" report. There were two suspicious individuals seen behind residences near the Woodlands Bank on West Southern Avenue and a third individual in a gold vehicle. It was also reported that one of the individuals was hiding behind a nearby dumpster.

The police stopped the gold vehicle and identified the driver as Stephen Moore. The police ran the license plate, which came back to a different vehicle registered to Philip Hall's mother. Philip Hall was a friend of Moore's and an acquaintance of Appellant's.

Appellant, who fit the description of one of the suspicious individuals, was walking on the other side of the street and keeping a very close eye on the police during the traffic stop of the gold vehicle. Prior to the vehicle being stopped, Appellant had been seen walking by the vehicle. When the police made contact with Appellant, he gave them a false name. Appellant also asked the police if "Stephen" got "locked up."

Officers walked over to the dumpster to look for the other suspicious person.

2

Near the dumpster, the police found a flesh-colored Halloween mask and a pair of dark colored gloves. The Halloween mask matched the mask worn by the shorter suspect from the Sunoco robbery. A short distance west of the mask, the police discovered a white Halloween mask with reddish synthetic hair. Wrapped inside the mask was a loaded .22 caliber handgun. It was apparent that the masks and other items had been recently placed there, as it was approximately 7:20 a.m. and the ground was covered in dew but the masks and other items of interest were not.

The police impounded the gold vehicle and obtained a search warrant. In the vehicle, the police found a black ski mask, a blue tote bag with white lettering, a green coat, and two pairs of faded blue jeans, which were consistent with the clothing worn and the bag used by the Sunoco robbers. Inside the ski mask was a long, red synthetic fiber similar to the reddish synthetic hair on the white Halloween mask. The police also found a packet of cigarettes in the vehicle, the color and markings of which matched the color and markings of cigarette butts recovered from in front of the bank on the day of the Sunoco robbery.

DNA was obtained from inside the Halloween masks. The police obtained a warrant to take hair and blood samples from Appellant so DNA testing and analysis could be conducted to determine if the DNA inside either of the Halloween masks matched Appellant's DNA. Although the DNA sample from the white mask with the reddish synthetic hair was a mixture of DNA from more than one individual, Appellant's DNA matched the DNA of the main contributor to that mixture. DNA from the flesh-colored Halloween mask matched Philip Hall.

Appellant was arrested and charged with robbery, theft by unlawful taking,

3

receiving stolen property, simple assault by physical menace, conspiracy to commit these offenses, and recklessly endangering another person related to the Sunoco robbery on October 11, 2009. The alleged co-conspirator for each conspiracy count was Philip Hall.

Appellant filed an omnibus pretrial motion which included a motion to suppress. Appellant asserted that the search warrant for his hair and blood was not based on probable cause, rendering the search and seizure illegal and mandating the suppression of any evidence obtained from these samples. The court denied Appellant's motion in an Opinion and Order dated May 22, 2013.

Appellant also filed a motion in limine to preclude any references to his conviction for conspiracy to commit robbery of Woodlands Bank, because it was not relevant or any relevance was far outweighed by the prejudicial effect. This conspiracy conviction was based on the events that occurred on October 13, 2009 with Appellant and Stephen Moore. The court denied Appellant's motion in limine in an Opinion and Order dated October 15, 2013 and docketed October 29, 2013.

Appellant waived his right to a jury trial, and a bench trial was held October 21-22, 2014. The court found Appellant guilty of all the charges and sentenced him to an aggregate term of 5-12 years' incarceration in a state correctional institution.

Appellant filed a timely post sentence motion, which challenged the court's denial of the motion to suppress contained in his omnibus pretrial motion, the court's denial of his motion in limine, the sufficiency of the evidence, and the weight of the evidence. The court denied Appellant's post sentence motion in an Opinion and Order entered on January 28, 2015.

4

Appellant filed a timely notice of appeal.

Appellant first contends that the court erred in denying his omnibus pretrial motion which sought to suppress the seizure of his hair and blood samples. The court cannot agree.

The police obtained a search warrant for the hair and blood samples, and the affidavit for that warrant set forth probable cause. As the court stated in its Opinion and Order entered May 22, 2013:

> Rule 203 of the Pennsylvania Rules of Criminal Procedure provides in pertinent part:
> (B) No search warrant shall issue but upon probable cause supported by one or more affidavits sworn to before the issuing authority in person or using advanced communication technology. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.
>
>      *    *    *
>
> (D) At any hearing on a motion for the return or suppression of evidence, or for suppression of the fruits of evidence, obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in paragraph (B).
>
> Pa.R.Crim.P. 203 (B), (D).
> In analyzing whether a warrant is supported by probable cause, the court is confined to the four corners of the affidavit. Commonwealth v. Coleman, 830 A.2d 554, 560 (Pa. Super. 2003), app. denied, 864 A.2d 1203 (Pa. 2004).
> The test for determining whether a search warrant is supported by probable cause is the totality of the circumstances.
> Pursuant to the totality of the circumstances test …the task of an issuing authority is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place…. It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate

5

had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common sense, non-technical manner.

*    *    *    *

[Further,] a reviewing court [is] is not to conduct a *de novo* review of the issuing authority's probable cause determination but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

Commonwealth v. Jones, 605 Pa. 188, 988 A.2d 649, 655 (Pa. 2010), quoting Commonwealth v. Torres, 564 Pa. 886, 764 A.2d 532, 537-38, 540 (2001)(citations omitted); see also Commonwealth v. Martinez, 2013 PA Super. 102 (May 2, 2013).

The [c]ourt does not hesitate in concluding that the affidavit establishes probable cause to believe that evidence of a crime would be found by collecting DNA from [Appellant]. More specifically, pursuant to the totality of the circumstances test and making a practical, common-sense decision, all of the circumstances set forth in the affidavit support a finding that there was a fair probability contraband or evidence of a crime would be found on [Appellant].

A robbery occurred on October 11, 2009 in South Williamsport. One of the suspects was wearing a ski mask, and the other was wearing "a scary Halloween mask." In an area where the suspects fled, the police found cigarette butts that were distinctive.

Subsequent investigation confirmed that one of the suspects was wearing a green coat, a dark colored ski mask, dark gloves and faded blue jeans. The suspect was also carrying a blue tote bag with white lettering or symbols on the side of it. The other suspect was wearing a "scary Halloween mask, dark colored gloves and faded blue jeans." A few days later police responded to suspicious activity near a bank located in South Williamsport. One of the suspects was apparently hiding behind a dumpster. Another suspect was the driver of a gold vehicle.

[Appellant], who fit the description of one of the suspects, was stopped and questioned by the police. He asked if Stephen, the driver of the vehicle, got locked up. Furthermore, he had been seen walking by the vehicle. Moreover, during the incidents, police officers found a rubber Halloween mask and a pair of dark colored gloves near a dumpster where one of the suspects was reportedly hiding. The mask matched the mask worn by one of the earlier robbery suspects. As well, officers located another Halloween mask nearby. Located in this Halloween mask was a reddish synthetic hair, as well as a handgun. It was apparent to the officers that the masks had recently been

6

placed there.

A subsequent search of the vehicle revealed numerous items consistent with items utilized by the individuals who robbed the store. These items included a ski mask, red synthetic hairs, a bright blue tote bag with white writing on the side, cigarettes with similar color and markings, a green coat, a black ski mask and two pairs of faded blue jeans.

The totality of the circumstances demonstrates that a robbery occurred at which the perpetrators wore particular clothing and donned ski masks and Halloween-type masks. Within a few days, police officers discovered a vehicle in which similar clothing, a similar mask and other similar items were found. Moreover, police found other items related to the robbery in the area where [Appellant] was located. Finally, and determinatively, [Appellant] was connected to both the initial robbery and the vehicle in which the inculpatory items were found. His description was similar, he referred to the driver of the automobile by first name, he inquired whether the driver was "locked up" and he was seen near the vehicle. Certainly, upon reviewing the affidavit, there was a fair probability that evidence of a crime would be found through obtaining hair samples and blood or oral swabs from [Appellant] for DNA comparison.

Trial Court Opinion (T.C.O.), 5/22/13, at 4-7.

Appellant next contends that the court erred in denying his motion in limine which sought to preclude his conviction for a prior robbery, because it only showed his criminal propensity and the relevance of the conviction was far outweighed by its prejudicial effect. Again, the court cannot agree.

The conviction was relevant to tie Appellant to the white Halloween mask with the red synthetic hair and the ski mask, coat and other items that the police recovered from the vehicle registered to Philip Hall's mother but which was being driven by Stephen Moore. This evidence, in conjunction with other evidence, showed that Appellant was one of the individuals who robbed the Sunoco.

It was the Commonwealth's theory that Appellant was the taller individual in the Sunoco robbery and that he wore the white Halloween mask underneath the black ski

7

mask. This theory was supported by : the still image from the ATM video surveillance that showed something white in the eyeholes of the black ski mask worn by the taller suspect; the red synthetic fibers that were found inside the black ski mask; the lab analysis that these red fibers and the red synthetic hair from the white Halloween mask were visually, microscopically, and chemically consistent; and the expert testimony that Appellant's DNA matched the DNA obtained from inside the white Halloween mask.

While there was ample evidence to connect Appellant to the white Halloween mask, the Commonwealth needed to link Appellant and/or the white Halloween mask to the black ski mask, because the person involved in the Sunoco robbery was wearing a black ski mask with white showing in the eyeholes.

The evidence was not admitted to show that Appellant had a propensity to commit robberies, but was admitted to show the identity of the person who wore the black ski mask and green coat in the Sunoco robbery and to indirectly establish a connection between Appellant and Philip Hall.

Unfortunately for Appellant, the "bank situation" which resulted in his conviction for conspiracy to commit robbery with Stephen Moore and the Sunoco robbery were intertwined, because the police investigation of the "bank situation" led to the discovery of various items used during the commission of the Sunoco robbery. Although Appellant's inquiry into whether Stephen got locked up shows that he knew Stephen Moore, it did not link Appellant to the gold Chrysler and its contents in the same manner or to the same extent that his conspiracy conviction did.

Appellant was walking around outside when the police arrived to investigate

8

the suspicious individuals and vehicle. If the court had only permitted the Commonwealth to introduce Appellant's inquiry about Stephen, Appellant could have attempted to portray the query as merely expressing concern for a friend or acquaintance. It did not provide as strong of a link to the vehicle and its contents as an admission that Appellant and Stephen Moore were co-conspirators on the date and at the time when Stephen Moore was operating a vehicle which contained some of the clothing that matched some of the clothing worn by the Sunoco robbers two days earlier. The vehicle also bore a registration plate belonging to Philip Hall's mother's Dodge Caravan. Therefore, Appellant's conspiracy conviction was an important link in the chain of evidence to connect him to Philip Hall and the clothing worn by the perpetrators of the Sunoco robbery.

Appellant also claims that even if the evidence was relevant, its relevance was outweighed by its potential for prejudice. Although the court may exclude relevant evidence if its probative value is outweighed by a danger of unfair prejudice, see Pa.R.E. 403, prejudice in this context does not mean harmful to Appellant's case. *Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa. Super. 2009). "'Unfair prejudice' means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, comment. The court was not required to sanitize the trial. *Page*, supra. It was merely required to ensure that the evidence was only used for proper purposes, and not for propensity, which could be accomplished through an appropriate cautionary instruction. *See Commonwealth v. Hairston*, 84 A.2d 657, 664-67 (Pa. 2014)(evidence of arson admissible to show the appellant's consciousness of guilt and intent to commit first-degree murder; trial court's cautionary instruction minimized the likelihood

9

that arson evidence inflamed the jury or caused it to convict the appellant on an improper basis). Moreover, Appellant ultimately waived his right to a jury trial and proceeded to trial before the court. The court fully understood the limited purposes for which this evidence was admissible. The court did not consider this evidence for Appellant's propensity to commit robberies; it only considered this evidence to the extent it linked him to the items worn and used by the perpetrators of the Sunoco robbery.

Appellant next asserts that the evidence presented by the Commonwealth was insufficient to establish the elements of each of the offenses charged when there was no competent evidence to identify Appellant as the individual who committed the robbery. The court thoroughly addressed this issue in its Opinion and Order entered January 28, 2015. For the benefit of the parties and the appellate courts, the court will reprint that Opinion here with minor changes.

On October 11, 2009 Kimberly Frey was working as a cashier at Sunoco A-Plus in South Williamsport, Pennsylvania. (N.T., 10/21/14, at 12-13). Two individuals entered the store and robbed her of cigarettes and cash. She described the two assailants as one being shorter, like 5'7" or 5'8", and the other one probably about 6'. (*Id.* at 15). They had "Halloween masks on, gloves and like a duffle bag." (*Id.*). She described her height as 5'7". (*Id.* at 16).

On cross-examination, Ms. Frey admitted that she believed that the robbery was committed by two white males because the voices sounded familiar and "the eyes." (*Id.* at 18, 19, 21).

The manager of the A-Plus Sonoco, Michael Gardner, testified that at the time of the offense the store had a video surveillance system. (*Id.* at 24). The video from the evening as well as still shots were shown to the court. The video depicted two individuals robbing Ms. Frey. The shorter individual wore a Halloween mask. The taller individual wore a black ski mask with something whitish or grayish or both under it. It did not appear to be flesh under the black ski mask. The taller individual also wore a green jacket and black gloves and was carrying a blue bag with white lettering.

10

Corporal Carl J. Finnerty of the South Williamsport Police Department testified that he responded to the robbery on October 11, 2009. He was informed that the actors turned left after they exited the store.

Citizens and Northern Bank was located in this area and he accessed video footage from the ATM at the front of the bank. (*Id.* at 33). A still photograph from the video was provided to the Court to view. It depicted an individual wearing a black ski mask with a white or gray material under the eyeholes. (*Id.* at 34).

Roy Snyder, a retired police officer from the city of Williamsport next testified on behalf of the Commonwealth. He was a canine handler and he and his police dog tracked the scent of the perpetrators. (*Id.* at 36-37). According to Mr. Snyder, the trail of the perpetrators went left out of the Sunoco, past the bank, across the street and then stopped. The perpetrators apparently went south on Market Street to Parakeet Alley. (*Id.* at 45).

Terry O'Connell next testified. He was a Sergeant with the South Williamsport Police Department in October of 2009. On October 13, 2009, a few days after the A-Plus Sunoco incident, he was on duty and he was dispatched to the 700 block of Matthews Boulevard for a "suspicious person report." (*Id.* at49-50). It was approximately 7:21 in the morning and Sergeant O'Connell made a traffic stop of a Stephen Moore (*Id.* at 50, 51). At the time of the traffic stop, Sergeant O'Connell noticed [Appellant] "walking down the street on the other side of the street and…keeping a very close eye on [them]." (*Id.* at 51).

As a result of the suspicious circumstances as explained by Sergeant O'Connell, he and Chief Chris Miller of the Penn College Police Department searched a rectangular area near the stop. (*Id.* at 53). In the search area, they found a mask and gloves, another mask, a gun and a cell phone. All of the items appeared to have been placed there relatively recently. (*Id.* at 54-59).

Sergeant O'Connell also obtained a search warrant for the vehicle being driven by Mr. Moore. In the vehicle he uncovered numerous items of interest. They included a blue "grocery type carrying bag", a black ski mask that had a strand of red "nylon hair" that was "in the one mask that was tucked under the wheel of the trailer", a green jacket and a cell phone charger. (*Id.* at 59-62).

The court had an opportunity to view the physical evidence including but not limited to the black ski mask, the blue bag and the green coat. The eyeholes of the black ski mask appeared to have been cut out with the one eyehole smaller than the other. (*Id.* at 63, 64). The blue bag had white lettering on it as well as a white symbol. (*Id.* at 65). The green coat had a patch on the right sleeve right shoulder area as well as some writing on the right upper chest area. (*Id.* at 66).

Chief Miller testified that he was assisting Sergeant O'Connell in connection with the traffic stop on October 13. (*Id.* at 87). He confirmed the

11

location of the items that were found in connection with the search and the fact that they appeared to have been placed there recently because they were dry while the grass was wet. (*Id.* at 89-91). Furthermore, he actually came in contact with [Appellant], who was seen "walking in the area of the levy." (*Id.* at 92). [Appellant] was walking away from where the items were located. In fact, considering the direction that [Appellant] was walking when he first saw Sergeant O'Connell, it is reasonable to infer that [Appellant] backtracked past where the incriminating evidence was located and toward the levy where he was first confronted by law enforcement.

Sergeant David Pletz next testified. He was employed by the Penn College Police and was asked to assist in connection with the investigation of the incident that occurred after the A-Plus Sunoco robbery. (*Id.* at 96-97). That morning he came in contact with [Appellant]. When he asked [Appellant] for identification, [Appellant] falsely told him that his name was "Justin Gonzalez." (*Id.* at 97). After confronting [Appellant] with the falsity of his representation, [Appellant] "changed a few things here and there." (*Id.* at 97). As a result, [Appellant] was taken into custody where he eventually provided his "true name." (*Id.* at 97-98).

Christine Hall testified that Stephen Moore and her son Phillip were friends, and [Appellant] was an "acquaintance" of Phillip but a friend of Mr. Moore. (*Id.* at 105-106).

Sergeant James Taylor testified. He was employed with the South Williamsport Police Department in October of 2009. On October 11, 2009, he was called in to assist in connection with the A-Plus Sunoco robbery investigation. (*Id.* at 115). He confirmed that the taller of the two suspects had the "black hood or ski mask" and a "greenish jacket." (*Id.* at 118, 119).

In connection with the investigation of the incident on October 13, 2009, Sergeant Taylor was present when the search warrant was served on the impounded vehicle being driven by Mr. Moore. (*Id.* at 120). Based upon what was recovered inside of that vehicle "it was apparent that those items – at least they appeared to have been used in the A-Plus robbery." (*Id.*). The items that looked consistent included the "blue Giant tote bag", "a black hood or ski mask" and "an olive drab green coat." (*Id.* at 120, 121).

He also concluded that the masks found by Sergeant O'Connell were connected to the incident at Sunoco. (*Id.* at 121). The "flesh tone" mask appeared to be the same mask that the shorter of the two suspects was wearing, while the white mask appeared similar to what the taller suspect was wearing underneath the black ski mask. (*Id.* at 121-122).

Further, the still shot from the Citizen and Northern Bank video depicted the green jacket, the black ski mask and even the white coloration coming through the eyeholes. (*Id.* at 122). As well, a red fiber similar to that found on the one Halloween mask was found inside of the black ski mask. (*Id,* at 122, 123). Indeed, the green jacket and tote bag recovered from the

vehicle appeared to be the same as those used in the A-Plus Sunoco robbery. (*Id.* at 124-125). Sergeant Pletz also obtained DNA samples from [Appellant]. (*Id.* at 125).

Sergeant Pletz testified regarding audio recordings from [Appellant]'s prison phone calls. (*Id.* at 132). The recordings, while not transcribed in the record, were listened to by the court. He also testified that the prison intake documents listed [Appellant]'s height as 6'4". (Transcript, p. 134).

Brunee Coolbaugh, a forensic scientist with the Pennsylvania State Police, testified as an expert in serology. (*Id.* at 148-149). She has worked in serology since 2004. She examined both of the Halloween masks and the black ski mask for saliva. She found saliva on each of the masks and cuts samples out of each mask to be sent for DNA testing. (*Id.* at 153-155). She consulted with a supervisor in DNA analysis and, in an effort to limit backlogs and time constraints, it was determined that only the Halloween masks would be submitted for DNA analysis because they were the better samples. (*Id.* at 159). She confirmed that the Halloween mask with hair on it and the red fibrous item that was found in the black ski mask were sent for trace analysis. (*Id.* at 161).

Nichols Plumley, a forensic scientist with the Pennsylvania State Police Crime Lab at the Harrisburg Regional Laboratory, testified as an expert in the field of trace analysis. (*Id.* at 165, 167). He scientifically compared the red fiber from the ski mask with the fibers from the Halloween mask. The red fibers were "visually, microscopically and chemically consistent." (*Id.* at 168).

Angela DiFiore, a forensic scientist who has worked for the Pennsylvania State Police DNA Division since June of 2010, testified as an expert in the field of forensic DNA. (*Id.* at 176). Ms. DiFiore compared a DNA profile from the one Halloween mask with a known profile from Phillip Hall. Mr. Hall was included as a contributor to that major mixture and it was "5.1 billion times more likely to be from" him than another individual. (Id. at 185-186). She was also able to develop a DNA profile for the same cut from the front of the Halloween mask with red hair. (*Id.* at 187). This was a "mixture profile" which was "consistent with three or more contributors" although it had a "single major contributor." (*Id.*). She explained that one individual contributed "distinctly more to the mixture." (*Id.*). The major contributor's profile was "more prevalent than the other's profiles." (*Id.* at 188). This major component from the mask with the red hair was a match to the known reference sample from [Appellant]. (*Id.* at 192).

On October 22, 2014, the trial continued. Among other witnesses, the Commonwealth called Kevin Rentzel a special agent with the Federal Bureau of Investigation. (N.T., 10/22/2014 at 8). He assisted in the investigation by obtaining relevant telephone records and analyzing them through "Pen-Link Software." (*Id.* at 24). Candidly, the [c]ourt did not find his testimony to be

13

particularly weighty, if at all.

In addressing a sufficiency of evidence claim, the court must determine whether the evidence introduced at trial and all reasonable inferences derived from the record, viewed in a light most favorable to the Commonwealth as the verdict winner, are sufficient to establish all elements of the offenses beyond a reasonable doubt. *Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011). Moreover, the Commonwealth may sustain its burden by wholly circumstantial evidence and need not preclude every possibility of innocence. *Commonwealth v. Orr*, 38 A.3d 868, 872 (Pa. 2011)(citing *Commonwealth v. Hansley*, 24 A.2d 410, 416 (Pa. Super. 2011)). "Any doubts regarding a [Appellant]'s guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of facts may be drawn from the combined circumstances." *Id.*

The court concludes that there was abundant circumstantial evidence sufficient to establish that [Appellant] was the perpetrator of the crimes to which he was convicted.

First, the [Appellant] pled guilty to a conspiracy to commit a robbery. This offense occurred on October 13, 2011 just two days after the October 11, 2009 incident at the Sunoco. Among the items found in [Appellant]'s co-conspirator's vehicle were the same black ski mask, green jacket and blue tote bag used in the A-Plus Sunoco robbery. Near where the vehicle was stopped, the police found Halloween masks, one of which was identical to the Halloween mask used in the A-Plus Sunoco robbery.

This crime to which the [Appellant] pled guilty tended to prove not only a common scheme or plan but also the identity of the [Appellant] as one of the perpetrators in both incidents. The court considered the elapsed time between the crimes, the geographical proximity of the crime scenes and the manner in which the crimes were committed or to be committed. See, *Commonwealth v. Judd*, 897 A.2d 1224, 1232 (Pa. Super. 2006).

As the Superior Court recently noted in *Commonwealth v. Tejada*, [103 A.2d 788 (Pa Super. 2015)], "[t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." [*Id.* at 792-93], citing *Commonwealth v. Cahill*, 95 A.3d 298, 300 (Pa. Super. 2014).

The video surveillance from the A-Plus Sunoco showed two individuals robbing the store on the date in question. The taller of the two suspects was wearing a black ski mask, a green coat with a patch on the right arm and blue jeans. He was carrying a blue tote bag with a white design on it. The shorter suspect was wearing a Halloween mask, black gloves and blue

14

jeans. The court, as factfinder, had no doubt after reviewing the video surveillance as well as the still photographs from both the A-Plus and Citizens and Northern Bank videos that underneath the black ski mask was another facial covering, and not flesh. The color was whitish gray and not flesh colored.

Found in Mr. Moore's vehicle a few days later was, among other things, the green jacket. There is no doubt in the court's opinion that the jacket was the same jacket used in the A-Plus robbery. It was the same color and it had markings on it that were identical. A blue tote bag was also found in the back of Mr. Moore's car. The court had no doubt in finding that this item also was identical to that used in the A-Plus robbery. It was of the same color, had the same shape and had the same markings on it.

Of significance was the black ski mask found in the back of Mr. Moore's car. It too was identical to the ski mask that was used in the A-Plus robbery. Indeed, the eyeholes that were cut out were different sizes. This was verified on the videotape, the still photos and in viewing the black ski mask itself.

At the time Mr. Moore was stopped, [Appellant] was seen on the opposite side of the roadway walking in an easterly direction. Yet when he was apprehended shortly thereafter, he was walking in a westerly direction. He had an opportunity and the court could infer that he walked past or near where the other incriminating items were located.

The one mask that was found was identical to the mask that was used in the A-Plus robbery. In comparing the still frames as well as the video, there were many similar characteristics such as the nose and the "half circle" on the profile.

The second mask that was found had red "fiber hair." A red fiber was also found on the black ski mask which was worn by the taller suspect during the A-Plus robbery. The inference is that the black ski mask was placed over the second Halloween mask with the red fiber. The evidence was clear that the fibers were visually, microscopically and chemically consistent. It is clearly a reasonable inference based upon all of the circumstantial evidence that the taller suspect wore the white grayish mask with the red hair under the black ski mask.

As well, there was determinative DNA evidence. On the white Halloween mask with the reddish hair, [Appellant]'s DNA profile was a major contributor and the chances of the profile not being his were extremely small.

While [Appellant] argued that his DNA could have gotten on the mask from wearing it on the morning of the intended bank robbery, such does not make sense. In [Appellant]'s conversation with his mother that was recorded at the prison he stated he was "planning to wear it." If [Appellant] had not worn it but as he stated was planning on wearing it, it is reasonable to

15

infer that his DNA found its way on the mask because he had worn it previously.

[Appellant] also made another admission that the court found particularly relevant. During the conversation with this mother while he was in prison, she confronted him about the mask and the fact that law enforcement was contending that it was the same mask. In what was an apparent slip-up, the [Appellant] stated "it ain't mine. The mask I had for that, for the other... ." He said further that "the bank situation don't got nothing to do with that situation."

Although the court had a difficult time following some of the telephone evidence, it was fairly clear that during the timeframe of both incidents, Mr. Moore and Mr. Hall had telephone conversations with each other.

With respect to [Appellant]'s height, there was an abundance of evidence that he was in the height range as estimated by the victim. There was no doubt in the court's mind that the individual on the surveillance tape and in the still photos was of a similar height to [Appellant].

In considering all of this evidence, the court has no hesitation in concluding that it was sufficient to conclude beyond a reasonable doubt that [Appellant] was the perpetrator of the crimes to which he was found guilty.

T.C.O., 1/28/15, at 2-12.

Appellant's final claim is that the verdict was against the weight of the evidence as there was no competent evidence to establish that he committed the robbery to the extent that it shock's one's sense of justice. In his post sentence motion, Appellant contended that the verdict was against the weight of the evidence because: the store clerk believed the Sunoco was robbed by two "white guys;" the store clerk said the robbers were between 5'8" and 6' and Appellant is 6'4"; the black ski mask worn by the robber was not tested for DNA evidence; the video of the robbery does not reveal any features of the taller robber; the Halloween mask cannot be clearly seen on the video to determine that it was worn under the black ski mask; and the DNA evidence on the Halloween mask was a mixture.

A weight of an evidence claim enables a judge to reverse a verdict only when

16

it is so contrary to the evidence as to shock one's sense of justice and the reward of a new trial is imperative so that right may be given another opportunity to prevail. *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 39 (2011)(citing *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 652-53 (Pa. 2008)). "The weight of the evidence is exclusively for the finder of fact who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Small*, 559 Pa. 423, 435, 741 A.2d 666, 672-73 (1999), cert. denied, 531 U.S. 829, 121 S. Ct. 80 (2000); see also *Tejada*, 107 A.3d at 795-96 (citing *Commonwealth v. Karns*, 50 A.3d 158, 165 (Pa. Super. 2012)).

The verdict did not shock the court's conscience. As the court noted when it denied Appellant's post sentence motion:

> Ms. Frey's belief that she was robbed by two white guys was speculative at best by her own admission. The height of the assailants as described by her was close to that of [Appellant] with respect to the taller one. The fact that the black mask was not tested for DNA is also of no moment since the white mask worn under it was tested and it connected [Appellant] to it. The failure of the video to allegedly not reveal any features of the taller robber is insignificant. The taller robber wore the black ski mask and the green jacket and carried the blue tote bag all of which were found in Mr. Moore's vehicle and all of which were intended to be used apparently by [Appellant] in the bank robbery. [Appellant's] contention that the Halloween mask could not be clearly seen on the video is correct. Circumstantially, however, the court concluded that it was worn under the black ski mask. Finally, the fact that the DNA evidence on the Halloween mask was a mixture misstates the testimony of the DNA expert. [Appellant] was clearly identified as the major contributor.

T.C.O., 1/28/15, at 13-14.

Furthermore, the police considered and excluded Stephen Moore and Davon Grissom as suspects in the Sunoco robbery, because neither of them matched the build and height of the taller robber on the video surveillance. Phillip Hall was the shorter robber. His

17

DNA was inside the flesh-colored Halloween mask worn by the shorter robber and his height and build were consistent with the images of the shorter robber on the video surveillance tape. Stephen Moore, who was around 5'9" and 230 pounds, was neither tall enough nor thin enough to be the taller robber. N.T., 10/22/2014, at 5. Although Davon Grissom's DNA also was detected on one of the Halloween masks, he was not tall enough to be the taller robber. *Id.* at 5-6. Grissom also could not have been the shorter robber, because at one point the shorter robber reached out his arm and one could see the white of his skin; Grissom is a dark skinned black male. *Id.* at 6. Therefore, while the clerk estimated that the taller robber was 6' and Appellant is 6'4", the court had no difficulty in concluding that he was the taller robber. This conclusion did not shock the court's conscience because: Appellant was tall and thin like the taller robber depicted on the video surveillance; his DNA was the major contributor to the DNA in the white or gray Halloween mask; the white or gray Halloween mask had red synthetic hair; a red fiber was found inside the black ski mask that was visually, microscopically and chemically consistent with the red synthetic hair on the Halloween mask; he was a friend or acquaintance with Phillip Hall and Stephen Moore; the green coat worn by the taller robber and the blue bag carried by him in the Sunoco robbery were found in the gold Chrysler being driven by Stephen Moore on October 13, 2009; Appellant had been seen near the vehicle and was acting suspicious; Appellant admitted, as part of his conspiracy conviction, that he conspired with Stephen Moore on October 13, 2009 to rob the Woodlands Bank; and Stephen Moore was too short and stocky to be the taller robber in the Sunoco robbery. From this evidence, one can easily conclude that Appellant was the taller robber who carried the blue bag and wore the green coat and the black ski mask with the white

18

Halloween mask underneath it which showed through the eyeholes during the Sunoco robbery.

DATE: _6-2-2015_                    By The Court,

_[signature]_

Marc F. Lovecchio, Judge

cc:    District Attorney
       Trisha Hoover, Esquire
       Work file
       Gary Weber, Esquire (Lycoming Reporter)
       Superior Court (original & 1)

19